J. S63012/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
 : PENNSYLVANIA
        v. :
 :
RICHARD FRANKLIN KEIPER, : No. 3261 EDA 2015
 :
        Appellant :

Appeal from the Judgment of Sentence, October 1, 2015,
in the Court of Common Pleas of Monroe County
Criminal Division at No. CP-45-CR-0002596-2013

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:    **FILED NOVEMBER 21, 2016**

Richard Franklin Keiper appeals the judgment of sentence in which the

Court of Common Pleas of Monroe County sentenced him to serve a term of

life in prison for first-degree murder.[1]

The trial court recounted the following factual background:

> On October 18, 1968, Alfred L. Barnes
> (Barnes) was shot three times in the head and killed
> in Effort, Monroe County, Pennsylvania.  His body
> was dumped in a desolate farm pasture and found
> the next day.  His car, subsequently determined to
> be the location in which he was shot, was later found
> in New Jersey.
>
> The Pennsylvania State Police (PSP) mounted a
> substantial investigation.  However, they were
> unable to uncover any meaningful leads until 1971

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(a).

when detectives interviewed Quaquo Kelly (Kelly). Kelly related that [appellant] told him he had shot a man who worked at Bethlehem Steel in the hand and that he had the guy's car. Kelly also stated that [appellant] tried to sell him the gun.

It is the prosecutor's brief references in his opening statement to what Kelly told PSP that formed the basis of [appellant]'s request for a mistrial and now forms the foundation of his appeal.

After interviewing Kelly, PSP confirmed that Barnes had worked at Bethlehem Steel. They also looked for [appellant]. However, they could not find him because, shortly after the shooting, [appellant] left the area and travelled around the southern or southeastern United States with a carnival before ultimately settling in Texas. As a result, the case went cold. At the time, there were no cold case units or procedures.

In 2012, the case was assigned to Trooper Donald Marsh. After reviewing the file and becoming familiar with the case, Trooper Marsh re-interviewed Kelly who confirmed the statements he made in 1971. Using modern means, PSP was able to locate [appellant] in Texas.

PSP relayed the case information to the Texas Rangers and asked them to interview [appellant]. Texas Ranger James Holland was assigned to the case. [Appellant] agreed to be interviewed. Ranger Holland interviewed him twice.

During the first interview, which was surreptitiously audio-recorded, [appellant] admitted to shooting Barnes, but said it was self-defense. Specifically, [appellant] claimed Barnes pulled a gun on him, a struggle ensued, and the gun accidentally fired.

The second interview was video-recorded with [appellant]'s consent. During the second interview, [appellant] again admitted to shooting Barnes. He

added the detail that he had shot Barnes three times.

. . . . On October 17, 2013, [appellant] was arrested in Texas. The PSP investigators conducted their own interview which, like the interview conducted by Ranger Holland, was recorded.

During this interview, [appellant]'s story changed. He stated that he met a man named Steve who convinced him to accept a ride with Barnes. While [appellant] and Steve were travelling with Barnes, Steve came up with the idea of stealing Barnes's car. When they stopped in Effort, Barnes pulled a gun. [Appellant] wrestled with Barnes over the gun. A shot was fired. However, [appellant] claimed that it did not hit Barnes. [Appellant] said that he took the gun, ran off, and threw the weapon. While away from the car, [appellant] heard shots fired. [Appellant] returned to the car to help remove Barnes, who had been shot in the head and was bleeding, but was purportedly still alive. In this version, as in others, Barnes was pleading with [appellant] not to steal his car, a new Ford Thunderbird. [Appellant] took the car and later abandoned it in New Jersey.

In some of the interviews, Kelly was mentioned briefly. For the most part, [appellant] was asked if he knew Kelly and was also asked if he had tried to sell him a gun. [Appellant] acknowledged knowing Kelly but denied trying to sell him a gun.

[Appellant]'s changing versions of events, most notably the descriptions of how Barnes was shot, were all inconsistent with the physical evidence and the opinion of the Commonwealth's expert. Among other things, while [appellant] mentioned shots during a struggle for the gun while in Barnes's car, Barnes was shot at least once form [sic] above.

. . . .

[Appellant]'s trial began on June 29, 2016. It spanned five trial days, exclusive of jury selection and the extended July 4th holiday weekend. Over the first four days, the Commonwealth presented twelve witnesses, including three experts and several state troopers who were involved in the original investigation, and submitted eighty-three exhibits, including the audio and video recordings of the interviews with [appellant]. As to the interviews, all three were played or presented and were accompanied by testimony from the officers who conducted them. On the last day of trial, [appellant] called two expert witnesses and submitted an exhibit.

In his opening statement, the assistant district attorney walked the jury through the history of the PSP investigation and this case from the death of Barnes in 1968 through [appellant]'s arrest in Texas in 2013. In doing so, the prosecutor made some references to Kelly. The references, with sufficient surrounding information to provide context, were as follows:

> There's information from a confidential source that [appellant] may have been involved so they start looking into him.

> Now we're in the early 70's, 1970 and ['71] and they find out about him. Looking at the criminal arrest record larceny of a motor vehicle, assaults; what do we know about this guy?

> They develop an association he may have had with someone with the outlandish name of Quaquo Kelly []. Kelly is a felon. They interview him. He gives him information. He talks about an incident where he was at a bar at Sixth and Linden in Allentown and he stayed in a room above the bar and [appellant] who he knows came over so he let

- 4 -

[appellant] stay overnight and [appellant] gave him information that he shot a guy in the hand from Bethlehem Steel and he had his car. And then he talks about trying to sell him a handgun but he tells him yeah, the gun was a revolver.

So they take that information. They try to corroborate it and then they try to locate [appellant]. And they heard through word-of-mouth he might be in Florida so they ran inquiries down there and they got a .22 caliber handgun registration from 1971 someplace down in Florida.

But they can't find him. They don't know where in Florida now he is. So '71, '81, nothing is happening. Nothing is happening . . . .

(N.T., 6/29/15, pp.45-46).

. . . . In 2010, a letter from Barnes's nephew prompted PSP to review the file, including Kelly's statement, and to make an effort to determine if Kelly was still around. (*Id.* at 46-47). He then moved to the point where Trooper Marsh became involved:

+He reviews the file. He reviews the case notes. He reviews the photographs that were taken. He reviews the remaining evidence and he sees this thing about [appellant] and this Quaquo Kelly statement.

So now he's using the databases that are available to a modern investigator and he locates Mr. Kelly and he talks to him. He lives in Allentown. He gives the basic information,

corroborated what he gave in '71. So where is [appellant]?

. . . .

(*Id.* at 48).

. . . . [The assistant district attorney] later described Ranger Holland's interview technique and what [appellant] disclosed:

. . . .

Sometimes he'll go into a story about things but the Ranger directs him back. How about a Mr. Kelly, a Quaquo Kelly, did you ever hear of him?

Oh yeah, he lived above Sixth and Linden above a bar. Did you ever try to sell any guns to him? No, no.

(*Id.* at 51). The assistant district attorney did not mention Kelly again in his opening. In fact, he did not from this point on substantively mention Kelly again in front of the jury or intentionally elicit information about him through any witness.

In his opening statement, counsel for [appellant] mentioned Kelly. Specifically, he stated:

. . . .

Beyond that, 1971 they got a lead, a guy by the name of Quaquo Kelly was interviewed. I'm going to ask you to think about what his motivations might have been at that time when he gave the statement in 1971. What his statement was when he gave it again later more recently in 2013. How his statement might change today.

. . . .

(*Id.* at 73-74).

At the time the openings were given, the Commonwealth intended to call Kelly as a witness. In fact, the assistant district attorney had previously spoken with Kelly for that purpose, at which time he observed that Kelly was in failing health and was generally not steady on his feet. It was the Court's understanding that Kelly had been subpoenaed and that the defense wanted to call him as well, or at least wanted to cross examine him.

However, sometime after opening arguments the Commonwealth became aware that Kelly had been hospitalized. Apparently, Kelly contacted one of the affiants to advise him of the hospitalization. In addition, [appellant]'s attorneys indicated that their investigator had confirmed that Kelly had been hospitalized. The investigator reported that Kelly had been released from the hospital and had confirmed that he had been subpoenaed for the first day of trial. However, as all counsel observed, Kelly did not appear for the first day of trial. Based on the new information, the assistant district attorney decided not to call Kelly as a witness, primarily because of Kelly's health and hospitalization. That decision was communicated to counsel for [appellant] and the matter was discussed between the attorneys for all parties. On the second day of trial, after we became aware of the development, the Court convened an in-chambers conference with [appellant]'s attorneys and the assistant district attorney to discuss the matter. (N.T., 6/30/2015, pp. 89-92; N.T., 7/2/2015, pp. 51-66; N.T., 7/6/2015, pp. 5-12).

On the second day of trial, the Commonwealth called former PSP trooper George Oressie as its third witness. During direct examination, the assistant district attorney did not elicit any information about Kelly or the statement that Kelly had given in 1971. However, [appellant]'s attorney asked questions about Kelly and the statement on cross examination.

After several questions were asked about this subject, the Commonwealth objected. (N.T., 6/30/2015, pp. 85-89). During the ensuing side bar conversation, the Commonwealth reiterated that it no longer planned to call Kelly as a witness, the issues or potential issues with not calling him were generally flagged, the topic of Kelly's health, release from the hospital, and availability or unavailability were generally discussed, and [appellant]'s lead attorney indicated that he did not as of the time of the sidebar conversation know whether Kelly was healthy enough to attend trial. At the suggestion of both the Commonwealth and the defense, we did not release the witness and told former trooper Oressie that he was subject to recall. (***Id.*** at 89-93).

Over the next two days, there was no mention of Kelly. However, the Court did briefly discuss the matter with counsel. In addition, we handed out two cases that addressed the potential issues, asked counsel to read them, and indicated a willingness to receive additional legal authority and argument. (See N.T., 7/2/2015, pp. 53-58 and 61; N.T., 7/6/2015, pp. 8-9).

On July 2nd, the fourth day of trial, the Commonwealth rested. Following a brief recess and with the jury out of the courtroom, counsel for [appellant] moved for a mistrial "based on statements made by the district attorney in his opening statement, he's obligated to fulfill those evidentiary promises he's made. Statements were made about Quaquo Kelly and things that he said and that evidence was not brought out." (N.T., 7/2/2015, p. 52). . . .

Trial court opinion, 2/2/16 at 2-10.

The trial court denied the motion for mistrial. The trial court determined:

[At] the time the assistant district attorney gave his opening statement he had a good faith belief that

> Kelly would be called as a witness, that he articulated an objectively reasonable reason for not calling Kelly, that [appellant] did not present evidence regarding or dispute the validity of the assistant district attorney's statements on which our findings were based, and that under the facts and circumstances of this case we did not believe that [appellant] suffered prejudice. . . .

*Id.* at 11-12.

Appellant did not ask the trial court for a special jury instruction regarding Kelly or his statements. On July 6, 2015, the jury convicted appellant of first-degree murder. On October 1, 2015, the trial court sentenced appellant to a term of life imprisonment without possibility of parole.

Appellant raises the following issue for this court's review:

> Did the trial court abuse its discretion by not granting [a]ppellant's Motion for Mistrial where evidentiary promises were made during the Commonwealth's Opening Statement and those promises were not brought out during the trial when the prosecutor's opening statement clearly created the impression that the Commonwealth intended to call Mr. Kelly as a witness given the level of detail contained in his alleged statement and influenced the defense in order to respond to the witness which was unduly prejudicial to the [a]ppellant's right to a fair trial?

Appellant's brief at 4.

> The standard governing our review of a trial court's refusal to grant a request for a mistrial has been previously well summarized by this Court:

> The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a "flagrant abuse of discretion." ***Commonwealth v. Cottam***, 420 Pa.Super. 311, 616 A.2d 988, 997 (1992); ***Commonwealth v. Gonzales***, 415 Pa.Super. 564, 570, 609 A.2d 1368, 1370-71 (1992). A mistrial is an 'extreme remedy . . . [that] . . . must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial.' ***Commonwealth v. Vazquez***, 421 Pa.Super. 184, 617 A.2d 786, 787-88 (1992) (citing ***Commonwealth v. Chestnut***, 511 Pa. 169, 512 A.2d 603 (1986), and ***Commonwealth v. Brinkley***, 505 Pa. 442, 480 A.2d 980 (1984)). A trial court may remove taint caused by improper testimony through curative instructions. ***Commonwealth v. Savage***, 529 Pa. 108, 602 A.2d 309, 312-13; ***Commonwealth v. Richardson***, 496 Pa. 521, 437 A.2d 1162 (1981). Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. ***Richardson***, 496 Pa. at 526-527, 437 A.2d at 1165.

***Commonwealth v. Stilley***, 455 Pa.Super. 543, 689 A.2d 242, 250 (1997).

***Commonwealth v. Bracey***, 831 A.2d 678, 682-683 (Pa.Super. 2003), ***appeal denied***, 844 A.2d 551 (Pa. 2004).

> The opening statement of the prosecution should be limited to a statement of the facts which he intends to prove, and the legitimate inferences deduced therefrom. ***Commonwealth v. Martin***, 461 Pa. 289, 336 A.2d 290 (1975). However, even if remarks made during an opening statement in a

> criminal proceeding are improper, relief will only be granted where the unavoidable effect is to prejudice the finders of fact as to render them incapable of objective judgment. ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (1976).

***Commonwealth v. Duffey***, 348 A.2d 1178, 1184 (Pa. 1988).

Further, a prosecutor's opening statement must be based on facts plus inferences that can be drawn from those facts, which he intends to prove, or evidence which he intends to introduce and not designed to inflame the passions of the jury. ***Commonwealth v. Jones***, 610 A.2d 931 (Pa. 1992).

Appellant argues that the prosecution's opening statement clearly created the impression that the Commonwealth intended to call Kelly as a witness given the level of detail revealed concerning his alleged statement in the Commonwealth's opening. Appellant further contends that this opening statement influenced his counsel to respond to the witness in a way that was unduly prejudicial to appellant's right to a fair trial. Appellant asserts that because his counsel believed that the Commonwealth would call Kelly as a witness and be subject to cross-examination, his counsel did not object to references to Kelly in other witnesses' statements. Appellant argues that the Commonwealth's true intent with regard to Kelly was that it hoped to get damaging information concerning appellant into evidence without calling Kelly as a witness because the Commonwealth was aware of Kelly's health and credibility issues. Consequently, Appellant believes that the mention of Kelly in the Commonwealth's opening statement had a great impact on the

jury because it is the only evidence other than appellant's own words that tie him to the homicide.

Here, as the trial court stated, the Commonwealth unquestionably referred to Kelly in the opening statement though it did not expressly state that it would call him as a witness. The trial court determined that there was an evidentiary basis for mentioning Kelly's statement because appellant admitted in recorded interviews that were placed into evidence that he shot Barnes, took his car, and denied offering to sell Kelly a gun. The trial court also determined that, at the time of the opening statement, the Commonwealth intended to call Kelly and did not learn until later that he had been hospitalized and then released two days before trial. The trial court further determined that the Commonwealth informed appellant's counsel that it would not be calling Kelly soon after it made the decision not to call him and did not refer to him again. As a result, the trial court concluded that the Commonwealth acted in good faith and intended to call Kelly as a witness at the time of the opening statement.

Additionally, the trial court determined that references to Kelly made in the opening statement were not prejudicial to appellant because they were made in the context of explaining to the jury the history of the case and the investigation which led to appellant's arrest. The trial court concluded that the combination of mentioning Kelly in the opening statement

and then not calling him as a witness did not render the jury incapable of returning a true and just verdict.

This court does not find that the trial court acted with a flagrant abuse of discretion when it denied the motion for mistrial. The trial court determined that the Commonwealth acted in good faith when it referred to Kelly's statement. The record reflects that there was other evidence to point to appellant shooting Barnes and taking his car, such as appellant's own statements. The record further reflects that the trial court offered appellant a specific curative instruction on the statement, but his counsel declined this opportunity so that he could raise it in his closing argument. (Notes of testimony, 7/6/15 at 25.) Appellant's counsel did mention Kelly in his closing:

> In the DA's opening he had mentioned a Quaquo Kelly and I believed he promised you things by mentioning him and what Mr. Kelly could bring to this case. He failed to fulfill that promise by not bringing him forward. Now he may say we could have called him; but again, it's not our burden. If he's a Commonwealth witness[,] it's not our burden to call these people.

*Id.* at 36.

Appellant has failed to prove with any specificity that the jury was prejudiced by the Commonwealth's reference to Kelly in its opening statement. This court agrees with the trial court that the mention of Kelly did not deprive him of a fair trial such that a mistrial was warranted.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/21/2016</u>